Eugene Sibley v. Mrs. M. V. Hayes et al.

No. 1147.   Decided December 4, 1902.

**Vendor and Vendee—Deficiency in Quantity—Risk Assumed by Purchaser.**

Where the parties, their negotiations being conducted by letter, after agreeing on terms of sale which required a survey to determine the number of acres in the land, entered into a new contract for the express purpose of obviating the difficulty growing out of the question of quantity, the purchaser claiming there was a deficiency, by which a lump sum of less amount was agreed on and survey dispensed with, the evidence disclosed, as matter of law, an undertaking by the purchaser to assume the risk of deficiency, and he could not recover back any portion of the purchase money, though it afterward developed that the surveys fell short by 369 acres of the amount of 1920 acres called for by the patents and deed. (Pp. 79-86.)

Certificate of dissent from the Court of Civil Appeals for the First District, in an appeal from Victoria County.

*A. B. Peticolas* and *Dupree & Pool,* for appellant.—When a sale in gross is made without reference in the negotiations or in consideration to any designated or estimated quantity of acres; or when a supposed quantity by estimation is mentioned or referred to in the contract only for the purpose of description and under such circumstances or in such manner as to show that the parties intended to risk the contingency of quantity, whatever it might be or however much it might exceed or fall short of that which was mentioned in the contract, it can not be modified by the chancellor when there has been no fraud, and in such cases no recovery can be had for a shortage.   This proposition is taken from Judge Coke's opinion in O'Connell v. Duke, 29 Texas, 312.

Equity can not relieve against a mistake as to the number of acres contained in a tract of land sold by metes and bounds, where there is no element of fraud.   From Judge Bell's opinion in Dalton v. Rust, 22 Texas, 154.   Wuest v. Moehrig, 57 S. W. Rep., 865.

When the purchaser has notice at the time of his purchase that there is a shortage and buys in gross relying upon his own judgment as to the number of acres of land in the tract, he is not entitled to recover for a shortage afterwards discovered, because it is more than he thought it was.   Garrett v. Burleson, 25 Texas Supp., 44.

The unvarying rule in regard to the grant of relief in equity on the ground of mistake is, that there must be either a mutual mistake of the parties, or a mistake of one of the parties, induced by the fraud or deception or wrong of the other party, and to entitle a party to relief upon either ground the proof must be clear, convincing, and practically beyond a reasonable doubt.   In this case the proof does not show a mutual mistake or fraud.   Clack v. Hadley, 64 S. W. Rep., 406.

No relief can be granted for unilateral mistake.   May v. Town Site Co., 83 Texas, 505.

*McCrarey & Austin* and *Proctors,* for appellees.—In a sale in bulk, if the vendor contemplates no shortage and the vendee contemplates some shortage, but not a gross one, and the shortage afterwards proves a gross one, then the parties were as mutually mistaken as to the existence of a gross shortage as if both had believed there was no shortage. Wuest v. Moehrig, 57 S. W. Rep., 864.

GAINES, CHIEF JUSTICE.—This case comes to us upon a certificate of dissent from the Court of Civil Appeals of the First Supreme Judicial District. The certificate is as follows:

"At the last term of the court, to wit, on the — day of June, A. D. 1902, in a cause therein pending, No. 3021, Eugene Sibley, appellant, v. M. V. Hayes et al., appellees, this court rendered a decision by which the judgment of the court below was reversed and judgment was rendered here in favor of the appellant, wherein the chief justice of this court dissented from the conclusions of law reached by the majority of the court which are material to the decision of the cause, and the appellees in said cause having filed a motion therein requesting this court to certify the points of dissent for the decision of the Supreme Court, the same are certified as follows:

"This was an action by the heirs and legal representatives of John V. Hayes, deceased, to recover of Eugene Sibley for an alleged gross deficiency in the acreage of land sold to the said John V. Hayes in his lifetime by the said Sibley, and whose purchase money notes therefor the representatives of Hayes had paid without knowledge of the deficiency. The defendant pleaded limitations; and substantially, that if there was a deficiency in the quantity of the land the purchaser bought with knowledge and took the risk of whatever shortage there might be. There was a trial by jury, to which the court submitted both questions, and a verdict was returned in favor of the plaintiffs for a gross deficiency of 369 acres at $2 an acre, $738, for which judgment was rendered with interest.

"In the year 1881 there was a remnant of vacant land between certain surveys located in Jackson County upon Arenosa Creek, on the west of certain other surveys located upon Lavaca River on the east, and one W. L. Thulmeyer with two certificates furnished him by the defendant Sibley, one for 640 acres in the name of Joseph Yeamans and one for 1280 acres in the name of R. T. Crain, appropriated this vacancy by files and surveys. The land was in an irregular and peculiar shape, and according to measurements as shown by the Land Office map then in use in Jackson County, comprised 1920 acres. Patents were issued upon these surveys May 17, 1883, for the quantity of land called for. They are prairie surveys and call for no marked objects, but only call for the lines of the adjoining surveys. Sibley conveyed to Thulemeyer an undivided one-half of the land appropriated by the two surveys. About the time these surveys were patented John V. Hayes, the ancestor of plaintiffs, moved to Jackson County and bought some of the adjoining surveys on both sides of the Crain and Yeamans surveys; and on November 3,

1884, he purchased from Thulemeyer for $1920 the latter's undivided one-half interest in the Crain and Yeamans surveys. After Hayes bought from Thulemeyer he fenced his pasture, which remained as he then fenced it up to the time of the trial below. The pasture did not inclose all of the Crain and Yeamans surveys, but left out of it a small part of the Yeamans on the south and considerable portion of the Crain on the north. These two surveys extend north and south of the body of Hayes' other lands. The controversy in this case arises out of the purchase by Hayes from Sibley of the latter's undivided one-half interest in the two surveys on June 18, 1890, for a consideration of $2000 evidenced by two promissory notes which were paid to Sibley by the widow of Hayes after his death on the date of their maturity, June 18, 1891. The deed recited the consideration as cash and described the land by metes and bounds in plain figures as containing 1920 acres as patented. Both are prairie surveys as stated, and the lines called for in the deed are the unmarked lines of the adjoining surveys. The Hayes homestead was on the Rodriguez league about one mile from the Yeamans survey. Sibley resided in Victoria. He had an agent, A. Schmidt, for the sale of the land, who resided in San Antonio. The negotiations for the sale and purchase of the land were nearly all by letter. Hayes offered Schmidt $3 an acre for Sibley's undivided interest in the 1920 acres owned by them and adjoining Hayes' other lands in his pasture. Schmidt wrote to Sibley on June 6, 1890, that he had written to Hayes that he could have whatever land adjoined him at $3 an acre and for him to have it surveyed and send the field notes. On same date Hayes wrote to Sibley: 'I received a letter from Mr. A. Scmidt concerning the land of yours that is in my pasture. I would like to buy, but as I have now no money on hand, I would like to take it without a payment on it right away. I would like to know on what terms you would let me have it, and what interest would be on the money. P. S.—This is the land which is in my pasture.'

"Sibley replied June 9, 1890: 'Yours of the 6th instant received. Yes, I told Mr. Schmidt I would sell you the land in your pasture at your offer of $3 per acre. You can pay part cash if you wish to. If not you need not pay any cash, but give your note or notes as may suit you at 10 per cent interest. If the notes are made on two years time or less than two years, I don't want any lien on the land, but just want your plain note. If you want to make the notes more than two years, I would like to have a lien on the land. I am going off in a few weeks to be gone four or five months, and if we trade on this basis it must be at once. What surveyor do you want to find out how much land is in your pasture? Let me know and let's try and agree on the same man.'

"To this letter of Sibley Hayes replied June 12, 1890, objecting to 10 per cent interest and offering 8 per cent. He stated that the prairie was so wet that the land could not be surveyed for two weeks. In reply to this letter Sibley wrote June 14, 1890: 'Your letter received yesterday. It is likely I will leave here before two weeks. Mr. Allen says he

can make the survey next week. How will that suit you? Let me know at once and I will tell Mr. Allen so he can make his arrangements to be there. He had better leave the train at Inez, had he not? Can you meet him there? P. S.—John, make me an offer for my entire interest there payable in your 8 per cent notes. If you don't want to make the offer per acre for 960 acres (since you say it is not all there), make me an offer in round figures for my entire interest there, whatever it may be. I am disposed to save the expense and trouble of a survey, and no doubt you are too.'

"Which Hayes, June 17, 1890, answered as follows: 'Your letter of 14th to hand. I know that there is not as much in our claim as we claim the tracts to contain. I will make you this offer, viz: Will give you $2 per acre for your 960 acres and give my note payable in twelve months, interest at 8 per cent, as you propose, and will take it as it is without any further survey. If you can not take this, let Mr. Allen come over to El Toro next Monday, and I will meet him there. Write to me and let me know what you will do in this matter. If you accept you can prepare the title, and send note over and I will sign.'

"Sibley wrote Hayes June 18, 1890: 'Your favor of the 17th inst. received and noted. I inclose herein deed to you and the patents. I have named $2000 in the deed as a consideration. I merely mention it as a round figure without reference to what I am to receive and I inclose two notes, one for $1500 and another for $700, aggregating $2200, which I think, everything considered, you should be willing to pay. If acceptable, sign and return the notes. If not, return the deed and patents. My plan is to leave here next Tuesday. In case you decline this trade I will write you Saturday whether to meet Mr. Allen at El Toro Monday. If I leave Tuesday I will not be here to make the deed when Mr. Allen finishes the survey, so in that case there will be no need of sending him. But if I don't get off when expected, we can have Mr. Allen go over, provided he says he can get through in time to complete the trade before I get off.'

"Hayes answered this letter June 20, 1890: 'Your favor of 18th inst. received, together with deed to me and two patents to land. I can not accept your proposition to pay $2200, as I am sure the land is not there and believe it will be cheaper for me to buy after a survey. Though under all the circumstances I will give $2000 and settle it up. If you accept this you can prepare another note or two if you prefer, and send over and I will sign and return them. The papers are left with Mr. Allen, Edna. Try and let me hear from you by to-morrow's mail.'

"On margin of this letter in Sibley's handwriting appears the following memorandum: 'Answer. June 21, 1890, and accepted and sent notes.'

"The trade was closed by the execution of two notes, one for $1300 and the other for $700, payable June 18, 1891. Hayes died in January, 1891. His wife and five sons survived him; the ages of the sons ranged from 18

to 10 years. His widow administered upon his estate and when the notes fell due paid them. It appears from the evidence that neither Sibley nor any of the plaintiffs knew of any deficiency in the acreage of the surveys. Sibley had never had the same surveyed and it was not shown that he was ever on the land. He made no representation or statements about the land except as found in his letters. The plaintiffs discovered that there was a shortage on having the lands of the estate of John V. Hayes surveyed for partition. The discovery was first made in October or November, 1898, and the survey of the lands was completed in July, 1899, and this suit was filed October 22, 1900. The finding of the jury of the amount of shortage in the surveys is fully supported by the evidence. It appears that when actually run out the Crain contained only 613 acres, and that the Yeamans contained according to one surveyor 377 and according to another 351 acres.

"The foregoing statement is supplemented as follows:

"1. The offer of $3 per acre made by Hayes to Schmidt, the agent of Sibley, was for the half interest of Sibley in that part of the land that lay in Hayes's pasture, which was less than the whole of the surveys and was shown to be only for his undivided half interest in 900 acres.

"2. The transcript in this case is ordered to be sent up with this certificate in order that the Supreme Court may examine the sketch of these and other tracts of land adjoining same and lying between the river and the creek and the maps therein contained. The only marked objects in the vicinity of said land were a wild peach tree at the upper river corner of the Gallardo league and a marked line through the timber for about a mile and a half on the upper line of said league, a live oak tree at the lower river corner of the Manso league, a postoak marked H at the northwest corner of the Hayes survey, a postoak marked D at the southwest corner of the McKay survey, and a marked line therefrom for some distance on the southern line of the McKay, a postoak marked C at the northwest corner of the McCrabb and a marked line on the west line of the McCrabb.

"3. The accompanying transcript is also referred to for the plaintiff's petition.

"4. Counsel for appellees have requested this court to include in this certificate other facts that are undisputed, but as the transcript will be before the Supreme Court they may direct the attention of that court to such facts in the transcript without the necessity of copying them herein.

"Upon the foregoing facts the question of limitation was presented by the appellant under appropriate assignments of error upon the action of the court in overruling appellant's exceptions to the petition, in charging the jury, and finally in overruling the motion for a new trial. It is the opinion of a majority of the court that the evidence shows that Hayes bought the land with knowledge of a shortage and proposed to take it at whatever acreage there might be, as shown by the letters between him

and the appellant negotiating the trade, and that proper diligence required him to ascertain the actual shortage by a survey of the land if he did not propose to be bound by his agreement as it appeared by its terms to be. That his offer as it appears from his letters to Sibley showed a willingness to risk the contingency of quantity even to the extent of a gross deficiency. That the character of the country and of the surrounding surveys and the fact that the land in question was located upon a supposed vacancy between adjacent old and large surveys with unmarked lines running through a prairie country, all should have impressed upon him the necessity of a careful survey to determine the amount of acreage in the tracts. That Hayes did not rely on the field notes in the patents, but claimed that the quantity of land called for in them was not there, and that as the unquestioned facts in the case showed that he bought with certain knowledge of a considerable deficiency in the quantity of land called for in the patents, diligence required of him if he did not intend to take the risk of whatever deficiency there might be to have the land surveyed and discover the actual amount of acreage, and such being the case, that the statute of two years' limitation was at once put in operation against him. That no facts are alleged in the petition or shown by the evidence that would prevent the statute of limitation from running, and it was error to submit the question of limitation to the jury for their determination. Bass v. James, 83 Texas, 110. Being of the opinion that the plaintiffs' cause of action appeared to be barred by limitation, it is the further opinion of the majority of the court that the judgment of the court below should be reversed and that judgment should be here rendered in favor of the appellant.

"The chief justice dissents from the decision of the majority of the court for the reason that he thinks the facts do not indicate that the parties contemplated a gross deficiency or that Hayes intended to take the risk of such deficiency. The evidence showed that there was a deficiency to the extent of about one half of the land, while the negotiations about the price showed that only an ordinary deficiency was in contemplation of the parties. The patents called for the full complement of 1920 acres, and the character of the country and the possession of the land were such that nothing like an accurate estimate of the quantity could be made without a survey, and there was no fact to show that Hayes could have suspected that there was more than an ordinary shortage. Mere knowledge of some shortage did not require any diligence of him to ascertain what it amounted to. He owned all the land contiguous to the main body of the two surveys. It lay in his pasture, and he had no occasion to have it surveyed. He died within a few months, and the plaintiffs, his wife and minor children, had not even the knowledge that would come of experience in such matters to incite them to diligence. He is of the opinion that the questions both of limitation and of intention to take the risk of a gross deficiency were properly sub-

mitted to the jury and that there are no errors in the record that require a reversal of the judgment.

"The points certified for the decision of the Supreme Court are:

"1.  Does the evidence show as a matter of law that the appellees bought Hayes' interest in the land, taking the risk of whatever deficiency might thereafter be disclosed?

"2.  Does the evidence show as a matter of law that the appellees' cause of action was barred by the statute of limitation of two years?"

We are of opinion that the first question should be answered in the affirmative and that it is neither necessary nor proper to answer the second.

1.  In regard to mistakes of parties who have entered into a speculative contract Pomeroy states the rule as follows:  "Where parties have knowingly entered into a speculative contract or transaction,—one in which they intentionally speculated as to the result,—and there is * * * an absence of bad faith, violation of confidence, misrepresentation, concealment, and other inequitable conduct, * * * if the facts upon which such agreement or transaction was founded, or the event of the agreement itself, turn out very different from what was expected or anticipated, this error, miscalculation, or disappointment, although relating to matters of fact, and not of law, is not such a mistake, within the meaning of the equitable doctrine, as entitles the disappointed party to any relief either by way of canceling the contract and rescinding the transaction, or of defense to a suit brought for its enforcement.  In such classes of agreements and transactions, the parties are supposed to calculate the chances, and they certainly assume the risks, where there is no element of bad faith, breach of confidence, misrepresentation, culpable concealment, or other like conduct amounting to actual or constructive fraud."  2 Pom. Eq., sec., 885.  So in the case of O'Connell v. Duke, 29 Texas, 312, this court, speaking through Mr. Justice Coke, quote with approval the following language from the opinion of the Supreme Court of Kentucky in the case Harrison v. Talbot, 2 Dana, 258.  "Sales in gross may be divided into various subordinate classifications: first, sales strictly and essentially by the tract, without reference, in the negotation or in the consideration, to any designated or estimated quantity of acres; second, sales of the like kind, in which, though a supposed quantity by estimation is mentioned or referred to in the contract, the reference was made only for the purpose of description, and under such circumcumstances, or in such a manner, as to show that the parties intended to risk the contingency of quantity, whatever it might be, or how much so ever it might exceed or fall short of that which was mentioned in the contract; third, sales in which it is evident, from extraneous circumstances of locality, value, price, time, and the conduct and conversations of the parties, that they did not contemplate or intend to risk more than the usual rates of excess or deficit in similar cases, or than such as might reasonably be calculated on as within the range of ordinary contingency; fourth, sales which, though technically deemed

and denominated sales in gross, are in fact sales by the acre, and so understood by the parties. Contracts belonging to either of the two first mentioned classes, whether executed or executory, should not be modified by the chancellor, when there has been no fraud. But in sales of either of the latter kinds, an unreasonable surplus or deficit may entitle the injured party to equitable relief, unless he has, by his conduct, waived or forfeited his equity."

In O'Connell v. Duke, the excess was 348 acres in a sale of a tract purporting to contain only 750 acres. It appeared that in the negotiations the parties contemplated a probable surplus of twenty-four acres only. Besides this the deed described the land in effect as containing 750 acres "or more," and the grantor bound himself to make good any deficiency in the quantity. It was held, that since "the principle on which the rule of law is founded that gives to the purchaser the excess in ordinary cases is his liability to loss in case of a deficit," and since the evidence showed that only a small surplus was anticipated, the grantor was entitled to relief. It is apparent that the propositions quoted with approval from the opinion of the Kentucky court were not all involved in the O'Connell case; but we think they are sound, and so far as applicable have been followed in subsequent decisions in this court.

We are of opinion, that the sale in the case before us falls within the category of "sales, * * * in which, though a supposed quantity by estimation is mentioned or referred to in the contract, the reference was made only for the purpose of description, and under such circumstances, or in such a manner, as to show that the parties intended to risk the contingency of quantity, whatever it might be, or how much soever it might exceed or fall short of that which was mentioned in the contract." The present case is free from all suspicion of fraud or misrepresentation. Hayes, the purchaser, was already the owner of an undivided one-half interest in the lands. He owned adjacent lands upon both sides of the tract and had a portion of it inclosed in his pasture. He resided within one mile of the land in controversy. The negotiations were by a written correspondence, conducted on the one side by Hayes, who was living near and occupied a part of the land, and on the other by Sibley's agent and Sibley himself, each of whom lived in a different county. The propositions first were for a sale of Sibley's undivided one-half interest in so much of the land as lay within Hayes' pasture, and resulted in an agreement to sell at $3 per acre when the quantity should be ascertained by a surveyor. On account of the difficulty of procuring a survey Sibley proposed to sell his whole interest for $2200. Hayes did not accept this, but made a counter-proposition to give $2000 for Hayes' interest in the entire tract. This was accepted and culminated in the sale in controversy. Hayes was of the opinion that there was a deficiency in the surveys, but Sibley did not concede that any deficit existed. It seems to us, therefore, that the transaction comes down to this: When Sibley considered the trouble and expense of making the survey in order to carry out the first agreement, he proposed to lump the matter off and

settle the controversy as to the quantity by proposing to take the chances of a loss by selling for a lump sum. The proposition he finally accepted was for $2000, which was but little over $2 per acre—provided there was no deficiency. Hayes had agreed to give $3 per acre for a part of the tract. Whether the part which was within his pasture and which he proposed to buy was of greater or less value per acre than the remainder, the statement in the certificate does not show. It is to be inferred, therefore, that when Sibley agreed to accept $2000 for the whole he made a liberal allowance for any deficiency in the quantity of the surveys, and must have understood that the sale was to be in gross and that he was risking a loss by reason of the probability that there was no material deficiency in the acreage called for by the surveys. So, also, it is to be inferred that Hayes also understood that the sale was of the tract, and not by the acre, and that he took his chances of a gain or loss—dependent upon whether the quantity was more or less than he supposed. It seems to us, therefore, that since the parties after agreeing upon one contract which required a survey to determine the number of acres in the land, entered into a new contract for the express purpose of obviating the difficulty growing out of the question of quantity, they should be held to have contracted with the view of taking their chances upon either a deficiency or excess of acreage, and neither should be permitted to assert a mistake in that particular. We conclude, therefore, that the undisputed testimony shows that the plaintiffs were not entitled to recover for the shortage in the land conveyed.

2. Since no cause of action was shown, the question of the statute of limitation becomes abstract.